# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **PAULA J. SAMS,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**NANCY A. BERRYHILL**,[1]<br>Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security,<br><br>    **Defendant.** | Case No. 4:17-cv-00074-GBC<br><br>**(MAGISTRATE JUDGE COHN)**<br><br><br>**OPINION AND ORDER TO DENY PLAINTIFF'S APPEAL** |

## OPINION AND ORDER TO DENY PLAINTIFF'S APPEAL

This matter is before the undersigned United States Magistrate Judge for decision. Paula J. Sams ("Plaintiff") seeks judicial review of the Commissioner of the Social Security Administration's decision finding of not disabled. As set forth below, the Court **DENIES** Plaintiff's appeal and **AFFIRMS** the Commissioner's decision in this case.

**I.     Procedural Background**

On December 30, 2013, and January 7, 2014, Plaintiff respectively filed applications for Disability Insurance Benefits ("DIB") under Title II and disability benefits under XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1382-1383 ("Act"), with a last insured date of December 31, 2014,[2] and a disability onset date August 9, 2011. (Tr. 30). On November 19, 2015, the

---

[1] Ms. Berryhill, Deputy Commissioner for Operations, is leading the Social Security Administration, pending the nomination and confirmation of a Commissioner. Pursuant to Federal Rule of Civil Procedure 25(d), Deputy Commissioner for Operations Berryhill should be substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of the Social Security Act, 42 U.S.C. § 405(g).

[2] Disability insurance benefits are paid if the individual is disabled by the last date that a claimant meets the requirements of being insured. See 42 U.S.C. § 423(a)(1)(A), (c)(1).

Administrative Law Judge ("ALJ") found Plaintiff was not disabled within the meaning of the Act. (Tr. 27-50). Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on December 9, 2016, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner of the Social Security Administration. (Tr. 1-6).

On February 13, 2017, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal a decision of Defendant denying social security benefits. (Doc. 1). On June 26, 2017, Defendant filed an administrative transcript of proceedings. (Doc. 14). On August 29, 2017, Plaintiff filed a brief in support of the appeal. (Doc. 147("Pl. Br.")). On October 27, 2017, Defendant filed a brief in response. (Doc. 20 ("Def. Br.")). On November 14, 2017, Plaintiff filed a reply. (Doc. 22 (Reply)).

**II.     Issues on Appeal**

On appeal, Plaintiff argues "[t]he ALJ erred as a matter of law in failing to properly consider the opinion of the treating physician." (Pl. Br. at 4).[3]

**III.    Facts in the Record[4]**

**A.     Background**

Plaintiff was born in June 1972 and thus is classified by the regulations as a younger individual through the date of the ALJ decision. (Tr. 230); 20 C.F.R. §§ 404.1563(c), 416.963(c). Plaintiff alleged disability due to: (1) Degenerative Disc Disease, issues with lumbar and cervical spine; (2) bone spurs; (3) anxiety; (4) shoulder pain; (5) migraine headaches; (6) left arm and elbow pain; (7) knee pain and swelling; (8) ankle swelling, and; (9) numbness in her hands and fingers.

---

[3] Plaintiff only challenges the ALJ's findings regarding physical impairments (Pl. Br. 2), thus the Court only addresses evidence pertinent to Plaintiff's physical impairments.

[4] Since the ALJ fully developed the record and the parties have adequately articulated Plaintiff's medical history in their briefs, the Court will only summarize the relevant facts to provide context to Plaintiff's impairments and address the issues raised.

(Tr. 70-84, 106). Plaintiff graduated with an associate degree in nursing and an associate degree in liberal arts. (Tr. 68).

**B. Summary of Relevant Treatment for Physical Impairments**

1. **Tulsa Pain Consultants: Andrew F. Revelis, M.D.; Martin L. Martucci, M.D.; Brad Helton, PA-C**

On June 30, 2014, Plaintiff sought follow-up treatment for lower back pain. (Tr. 710). Dr. Revelis noted that Plaintiff maintained on Norco at 7.5 mg t.i.d. p.r.n. to alleviate the pain. (Tr. 710). Plaintiff reported not getting adequate relief, had no significant relief from injection therapy, and still experienced low back pain of a level six out of ten. (Tr. 710). Upon examination, Dr. Revelis observed that Plaintiff did not use an assistive device to walk, was able to stand from a seated position without any significant difficulties or limitations, and was able to move all four extremities. (Tr. 710). Dr. Revelis noted that there were no new signs of gross motor or sensory deficits. (Tr. 710). Dr. Revelis assessed Plaintiff with post lumbar fusion pain and lower extremity radiculopathy. (Tr. 710). Dr. Revelis started Plaintiff on Xartemis, continued Norco, and recommended follow-up assessment in three months, or sooner if problems arise. (Tr. 710).

In the subsequent visits from August 28, 2014, through June 15, 2015, the notes indicated continued report of experiencing a pain level between five and seven on a scale where ten is the highest, and subsequent adjustments to medications and dosages. (Tr. 695-708). In all of the records within that time period the notes indicated that Plaintiff: (1) did not use an assistive device to walk; (2) was able to stand from a seated position without any significant difficulties or limitations; (3) was able to move all four extremities, and; (4) there were no new signs of gross motor or sensory deficits. (Tr. 695-708).

2. **Saint John Clinic: Brent Laughlin, M.D.**

On July 17, 2014, Plaintiff reported experiencing left knee pain for over two years and was treating the pain with ibuprofen. (Tr. 761). Plaintiff reported that the left knee never "locked," however it had been painful and swollen at times which limited ambulation. (Tr. 761). There was previous arthroscopy of the left knee and treatment for torn medial meniscus. (Tr. 761). Dr. Laughlin assessed Plaintiff chondromalacia of the left knee. (Tr. 762).

On February 2, 2015, Plaintiff reported experiencing back pain and left leg radiculopathy. (Tr. 766-67). Dr. Laughlin noted no motor or sensory losses, and a positive SLR bilaterally and assessed with "backache." (Tr. 767).

On October 8, 2015, Plaintiff reported that she was experiencing back pain. (Tr. 829). It was noted that she had an artificial disc in 2011 and more surgery was not recommended. (Tr. 829). Plaintiff reported that ever since surgery, she had experienced continued back pain, pain radiating to both legs, and a significant limitation in activities. (Tr. 829). Upon examination, Dr. Laughlin observed no motor or sensory losses, positive Phalen's and Tinel's signs, decreased sensation in the hands, and a tender left knee and shoulder in response to firm palpation. (Tr. 829). Dr. Laughlin assessed Plaintiff with radiculopathy of the lumbar region and tendonitis of the left knee. (Tr. 829).

3. **Progress Notes: James Griffin, M.D., Antoine Jabbour, M.D.; Colby Coulson, M.D.**

In a treatment record dated September 8, 2014, Plaintiff reported moderate left knee pain that is exacerbated by climbing stairs and denied any additional symptoms. (Tr. 787). Dr. Griffin noted that Plaintiff remained "ABLE to perform their present job duties at this time." (Tr. 787). Upon examination, Dr. Griffin noted no knee effusion, the MRI scan revealed mild chondromalacia and mild malalignment of the patella and that day's x-rays of the left knee were normal. (Tr. 787). Plaintiff did not get relief from physical therapy and Dr. Griffin administered injections to the patella which provided good immediate relief. (Tr. 787). Dr. Griffin noted

"exquisite tenderness" in the patellar tendon region, range of motion was full and painless with active flexion and extension, and there was no crepitance, no instability upon manual testing, and strength was 5/5 with flexion and extension. (Tr. 788). Dr. Griffin observed that Plaintiff's gait was normal and the radiology results did not demonstrate any fractures or osteoarthritis. (Tr. 788). Dr. Griffin assessed Plaintiff with left patellar tendonitis and left popliteal tendinitis. (Tr. 788).

On September 30, 2014, Plaintiff sought follow-up treatment for left knee pain. (Tr. 789). It was noted that her knee pain was moderate, had an aching quality, and that she has partially responded to treatment of NSAIDs and steroid injections. (Tr. 789). The notes where substantively identical to those in the September 8 record, including that Plaintiff's gait was normal and that she remained "ABLE to perform their present job duties at this time. (Tr. 789-90). Dr. Griffin noted the previous injections provided relief for approximately two weeks and administered more injections. (Tr. 789-90).

On October 30, 2014, Plaintiff sought follow-up treatment for left knee pain and right hip pain. (Tr. 791). The notes where substantively identical to those in the September 8 and September 30 records, including that Plaintiff's gait was normal and that she remained "ABLE to perform their present job duties at this time. (Tr. 791-92). It was noted that she started to complain of pain over the right iliac crest (hip). (Tr. 791). In addition to left patellar tendonitis and left popliteal tendinitis, Dr. Griffin assessed Plaintiff with low back pain. (Tr. 792). Dr. Griffin noted the previous injections provided relief for approximately four weeks and administered more injections to the left knee and right iliac crest. (Tr. 791-92).

On November 25, 2014, Plaintiff sought follow-up treatment for left knee pain and right hip pain. (Tr. 793). The notes where substantively identical to those in the October 30 record, including that Plaintiff's gait was normal and that she remained "ABLE to perform their present job duties at this time. (Tr. 793-94). Dr. Griffin noted the previous injections provided relief for

approximately four weeks, however, noted that her patellar tendinitis had "been resistant to injection," and referred her to another doctor for a possible Tenix procedure on her patellar tendon. (Tr. 793).

On December 18, 2014, Plaintiff reported that although she has a variety of different aches and pains, "her primary pain is about half of an inch distal to her inferior pole patella over the patellar tendon." (Tr. 795). Plaintiff also reported on anteromedial and anterolateral pain. (Tr. 795). Plaintiff reported that she fall frequently and she was unsure what was the cause for the falls. (Tr. 795). Upon examination Dr. Jabbour noted "no knee effusion, full extension, full flexion," with "slight crepitus on range of motion," and "some pain anteromedially and anterolaterially," however, the majority of the pain was over the patellar tendon region. (Tr. 796). Dr. Jabbour assessed Plaintiff with left patellar tendonitis and ordered an MRI of the left knee. (Tr. 797).

On December 23, 2014, Dr. Griffin noted that the previous injection was "completely successful," and with "good local relief initially." (Tr. 798). Dr. Griffin opined that Plaintiff remained "ABLE to perform their present job duties at this time." (Tr. 798). Examination revealed tenderness over popliteus insertion, no effusion, and no crepitance. (Tr. 798). Dr. Griffin assessed Plaintiff with left popliteal tendinitis and administered more injections. (Tr. 798-99).

An MRI dated December 29, 2014, revealed "a small deep infrapatellar bursal fluid collection which is unchanged compared to prior examination from 2008 and unlikely to represent the source of [Plaintiff's] pain. (Tr. 800-01).

On January 8, 2015, Plaintiff reported that she still experienced a lot of anteromedial knee pain and did not experience any posterolateral knee pain. (Tr. 802). Upon examination, Dr. Jabbour noted tenderness to palpation anteromedially as well as pain over the medial joint line and no significant pain over the pes anserine region. (Tr. 802). Dr. Jabbour noted that Plaintiff had a negative McMurray, no significant pain in the patella tendon and no pain over the popliteus tendon.

(Tr. 802). Dr. Jabbor noted that the recent MRI revealed some chondromalacia medially in that area where she demonstrated pain, the patellar tendon was intact, and there was no abnormality in the patellar tendon. (Tr. 801). Dr. Jabbor assessed Plaintiff with left knee pain. (Tr. 802). Dr. Jabbour did not recommend any Tenex procedure and presented the option that she could return to Dr. Griffin for additional steroid injections under ultrasound guidance. (Tr. 802).

On January 22, 2015, Dr. Griffin noted that Plaintiff's previous steroid injection was completely successful and that Plaintiff remained "ABLE to perform their present job duties at this time." (Tr. 804). Examination revealed tenderness over popliteus insertion, no effusion, and no crepitance and Dr. Griffin assessed Plaintiff with left popliteal tendinitis and chrondral defect lateral tibial plateau and administered injections. (Tr. 804-05).

On February 24, 2015, Dr. Griffin noted that the previous injection was partially successful and that she remained "ABLE to perform their present job duties at this time."(Tr. 806). Plaintiff reported numbness in the fourth and fifth fingers on her right hand and had previously had ulnar nerve transposition on her left arm. (Tr. 806). Dr. Griffin noted that Plaintiff had a positive Tinel sign at the elbow "but good motor and sensory exam," and Dr. Griffin advised her to "keep all pressure from the area." (Tr. 806).

On March 31, 2015, Plaintiff reported experiencing pain in the left knee and left shoulder. (Tr. 808). Dr. Griffin noted that the previous knee injection was partially successful and that Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 808). Dr. Griffin noted that Plaintiff underwent arthroscopic subacromial decompression in the left shoulder years ago and he administered injections. (Tr. 808). Upon examination of the shoulder Dr. Griffin noted a positive Hawkins sign and 5/5 rotator cuff strength. (Tr. 808). Examination of the left knee revealed tenderness over popliteus insertion and over the semimembranous insertion, with no

effusion, and no crepitance. (Tr. 808). Dr. Griffin assessed Plaintiff with left popliteal tendinitis, left bursitis/rotator cuff, and chondral defect lateral tibial plateau. (Tr. 809).

On April 30, 2015, Dr. Griffin noted that the previous injections were partially successful and Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 810). After the current administration of injections Plaintiff continued to report pain. (Tr. 810). Dr. Griffin ordered a new MRI scan to determine the etiology of the pain. (Tr. 810). Upon examination of the shoulder Dr. Griffin noted a positive Hawkins sign and 5/5 rotator cuff strength. (Tr. 810). Examination of the left knee revealed tenderness over popliteus insertion and over the semimembranous insertion, with no effusion, and no crepitance. (Tr. 810). Dr. Griffin assessed Plaintiff with left popliteal tendinitis, and chondral defect lateral tibial plateau. (Tr. 811).

An MRI dated May 13, 2015, revealed a normal MR signal with no marrow edema with an impression "[m]ild chondromalacia the medial compartment." (Tr. 812-13). On May 18, 2015 Dr. Griffin noted that the previous shoulder injection was partially successful and Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 814). Dr. Griffin noted that the recent left knee MRI revealed no evidence of meniscal tear. (Tr. 814). Upon examination of the shoulder Dr. Griffin noted tenderness over the lateral aspect of the acromion, negative A/C joint compression test, a positive Neer, and a positive impingement test. (Tr. 814). Dr. Griffin assessed Plaintiff with left impingement and administered injections. (Tr. 814).

On June 30, 2015, Dr. Griffin noted that the previous knee injection was partially successful and Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 816). Examination of the left knee revealed posteromedial tenderness and Dr. Griffin assessed Plaintiff with: (1) bursitis of the rotator cuff; (2) left chondral defect lateral tibial plateau; (3) impingment; (4) patellar tendonitis; (5) popliteal tendinitis, and; (6) left semi-membraneous bursitis. (Tr. 817). Dr. Griffin administered injections. (Tr. 817).

On August 4, 2015, Dr. Griffin noted that the previous knee injection was partially successful and Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 818). Dr. Griffin noted that Plaintiff had signs of subacromial burstisis in the left shoulder, and he injected the left shoulder. (Tr. 818). Examination of the left shoulder revealed positive Hawkins sign, and 5/5 rotator cuff strength. (Tr. 818). Examination of the left knee revealed tenderness over popliteus insertion, no effusion, and no crepitance and Dr. Griffin assessed Plaintiff with: (1) bursitis of the rotator cuff; (2) left chondral defect lateral tibial plateau; (3) impingement; (4) patellar tendonitis; (5) popliteal tendinitis, and; (6) semi-membraneous bursitis. (Tr. 818-19). Dr. Griffin administered injections. (Tr. 818-19).

On September 15, 2015, Dr. Griffin noted that the previous knee injection was partially successful and Plaintiff remained "ABLE to perform their present job duties at this time."(Tr. 820). Dr. Griffin noted that Plaintiff had signs of subacromial burstisis in the left shoulder, and he injected the left shoulder. (Tr. 820). Examination of the left shoulder revealed a positive Hawkins sign, and 5/5 rotator cuff strength. (Tr. 820). Examination of the left knee revealed tenderness over popliteus insertion, no effusion, and no crepitance and Dr. Griffin assessed Plaintiff with: (1) bursitis of the left rotator cuff; (2) left chondral defect lateral tibial plateau; (3) patellar tendonitis; (4) left popliteal tendinitis, and; (6) semi-membraneous bursitis. (Tr. 820-21). Dr. Griffin administered injections. (Tr. 21).

**C. Medical Opinions**

1. **Consultative Examination: Benjamin Roberts, D.O.**

On August 30, 2014, Dr. Roberts examined Plaintiff and assessed the extent of her physical limitations. (Tr. 685-91). Plaintiff reported: experiencing back pain for several years, shoulder and elbow pain; experiencing constant back pain at a level five out of ten, with pain radiating to right leg; movement exacerbates pain resting alleviates pain; left shoulder pain is one out of ten with

pain exacerbated by movement, and; previous surgery for ulnar nerve injury. (Tr. 685). Reported past medical history included asthma, back surgery, elbow surgery, left shoulder surgery, and left knee arthroscopy. (Tr. 685). Based on Plaintiff's medical history, Dr. Roberts assessed Plaintiff with: (1) back pain with radiculopathy; (2) left shoulder pain; (3) left elbow pain; (4) depression, and; (5) anxiety. (Tr. 686). Upon examination, Dr. Roberts noted that Plaintiff demonstrated equal range of motion throughout the extremities and pitting edema in both lower extremities. (Tr. 686). Dr. Roberts observed that Plaintiff's heel to toe walking was equal bilaterally, range of motion of the spine was without defect, straight leg raise was negative in the seated and supine positions, and exhibited tenderness to palpation over the lower back. (Tr. 686, 691). Dr. Roberts observed that Plaintiff's gait was stable with normal speed and stability and that she did not require the use of assistive devices to ambulate. (Tr. 686). Dr. Roberts completed a form which indicated a normal range of motion for Plaintiff's back, hips, knees, ankles, shoulders, elbows, wrists, and fingers. (Tr. 688-91). Dr. Roberts opined that there was no sensory loss in the first three fingers, she could effectively oppose the thumb to fingertips, manipulate small objects, and grasp tools such as a hammer. (Tr. 690). Dr. Roberts noted tenderness in the lower back and no muscle spasms in the lumbosacral spine. (Tr. 691). For examination of the cervical spine, Dr. Roberts noted that Plaintiff did not demonstrate any tenderness or muscle spasm. (Tr. 691). Dr. Roberts did not render an opinion regarding job related activities Plaintiff could do given her limitations.

   **2. Agency Reviewing Opinion: Dr. Karl K. Boatman, M.D.**

On September 9, 2014, Dr. Boatman reviewed Plaintiff's medical records and rendered an opinion regarding the extent of Plaintiff's limitations and the impact of the limitations on Plaintiff's ability to work. (Tr. 123-136). In reviewing Plaintiff's medical history Dr. Boatman summarized that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk six hours in an eight-hour day; (4) sit for a total

of six hours in an eight-hour day, and ; (5) push and/or pull without limitation. (Tr. 131). In support of this opinion, Dr. Boatman summarized Plaintiff's treatment history including: (1) a May 2010 record regarding cubital tunnel release performed in January 2010 (Tr. 466-67, 470, 477-78); (2) a June 2011 MRI of the lumbar spine which revealed L4-5 asymmetric annular disc bulge to the right with ligament flavum, hypertrophy, causing mild thecal sac narrowing, moderate to severe narrowing of the right and mild to moderate narrowing of the left L4-5 neural foramina (Tr. 548); (3) an April 2012 MRI of the cervical spine revealing mild to moderate right and minimal left foraminal stenosis at C3-4 region with mild rightward canal stenosis. She also had mild levoscoliosis curvature mid-cervical spine (Tr. 606), and; (4) a May 2014 transforaminal lumbar epidural steroid injection (ESI) (Tr. 620). (Tr. 131). Dr. Boatman opined that Plaintiff did not have any postural limitations or manipulative limitations. (Tr. 131). Dr. Boatman noted Plaintiff's May 2014 visit with Dr. Roberts (Tr. 132 (summarizing Tr. 685-91)).

Regarding Plaintiff's activities of daily living, Dr. Boatman summarized from Plaintiff's function report (Tr. 289-98):

> She can perform personal care. She can prepare her own meals. She sweeps, does laundry, vacuums and does dishes. It takes her longer than it used to. Her kids help her. She drives. She shops in stores for groceries, clothes and household items. She enjoys watching television. She lays down while she watches television. She helps her kids with homework and plays board-games occasionally. She takes her kids to school on a daily basis. She can walk a quarter of a mile without having to stop to rest.

(Tr. 132). Dr. Boatman concluded that Plaintiff could perform light work. (Tr. 132).

### 3. Treating Source: Brent Laughlin, M.D.

On October 8, 2015, Dr. Laughlin completed a form in which he opine that Plaintiff could: (1) occasionally lift and/or carry less than ten pounds; (2) stand and/or walk less than two hours in an eight-hour workday since standing more than ten minutes exacerbates back pain; (3) must periodically alternate sitting and standing to relieve pain of discomfort, and; (4) limited in pushing

and pulling due the left shoulder and left knee. (Tr. 823, 833-34)). Dr. Laughlin explained that these limitations were due to decreased range of motion, observed pain, and evidence of previous surgery. (Tr. 834). Dr. Laughlin opined that due to aggravation of the low back and knee pain, Plaintiff could occasionally balance and stoop, and never climb, kneel, crouch, or crawl. (Tr. 834). Due to shoulder bursitis and carpel tunnel syndrome, Dr. Laughlin opined that Plaintiff could" (1) occasionally reach in all directions; (2) occasionally handle; (3) frequently feel; (4) and frequently finger. (Tr. 824, 835). Dr. Laughlin explained that Plaintiff demonstrated positive Phalen's and Tinel's signs and equivocal tests for sensation. (Tr. 824, 835). Dr. Laughlin noted that Plaintiff's ability to maintain attention and concentration on work tasks throughout an eight-hour day was significantly compromised by taking narcotic medication (Tr. 824, 835). Dr. Laughlin opined that due to back and knee issues, Plaintiff should limit exposure to hazards since balance could be adversely affected and cause falls. (Tr. 825. 836). Dr. Laughlin opined that due to asthma, Plaintiff should have limited exposure to dust, humidity/wetness, fumes, odors, chemicals, and gases. (Tr. 825, 836). Dr. Laughlin opined that Plaintiff did not have mental limitations, rather physical limitations due to continued back pain after previous surgery and pain with range of motion. (Tr. 827, 838).

**IV.     Legal Standards and Review of ALJ Decision**

To receive disability or supplemental security benefits under the Act, a claimant bears the burden to demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A). The Act further provides that an individual:

> shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Plaintiff must demonstrate the physical or mental impairment "by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750. The claimant bears the burden of proof at steps one through four. See Wells v. Colvin, 727 F.3d 1061, 1064 at n.1. (10th Cir. 2013). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Id.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See e.g., 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the [Administrative Law Judge's] findings in order to determine if

the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A.     **Weight to Treating Physician Opinion**

Plaintiff argues that the ALJ erred in failing to give great weight to Dr. Laughlin's October 2015 opinion. Pl. Br. at 6-8. In the November 2015 decision, the ALJ summarized Dr. Laughlin's October 2015 opinion and explained:

> Although the above considerations are severable, no one consideration, standing alone, is usually determinative of the weight an opinion should be given. For example, the fact that claimant saw Dr. Laughlin in a treating capacity on more than once occasion, standing alone, does not render his opinion probative. I have given Dr. Laughlin's opinion little weight as it is inconsistent with the other evidence of record. For example, in May of 2015 claimant was in no apparent distress, was not using a walking assistive device, and was able to stand from a seated position with no significant difficulties or limitations. She had movement in all 4 extremities with no new signs of gross motor or sensory deficits (Exhibit 8F/3). Dr. Martucci noted she would transition off of Norco and onto MSIR (Exhibit 8F/3). On June 15, 2015 claimant reported MSIR was working well and she did not wish to make any changes. No other changes were noted (Exhibit 8F/1).
>
> While I have provided limitations based on claimant's conditions, I find the limitations provided by Dr. Laughlin are extreme and not supported by the overall evidence of record. For example, limiting the claimant to occasional reaching in all directions would mean that her arms would be immobile for all practical purposes for 6 hours out of an 8-hour day. That is inconsistent with Dr. Laughlin's opinion that the claimant could do fingering and feeling frequently as objects must first be reached for by extending the arms before they can be fingered or felt. (See SSR 85-15- reaching means extending of the hands and arms in all directions). Nothing in Dr. Laughlin's treatment notes submitted with his MSS would justify immobilizing the claimant's arms for a majority of the workday, and there is nothing in Dr. Laughlin's treatment records at 3F that offer any reasonable support for that proposition. In contrast, in the physical consultative examination conducted by Dr. Roberts on August 30, 2014, the actual physical examination results were fully normal, including full range of motion both shoulders, cervical spine, and lumbar spine, with no pain noted on range of motion. It was also specifically found that the claimant could handle and manipulate small objects and could grasp tools such as a hammer. 7F/4-7. These fully normal results are completely inconsistent with Dr.

> Laughlin's extreme limitations given 10 months later, which causes me to have substantial doubts about the objectivity of Dr. Laughlin's opinions

(Tr. 41). The undersigned finds substantial evidence supports the ALJ's allocation of weight to the medical opinions. The Regulations generally require the ALJ to "give more weight to opinions from [a claimant's] treating sources" ("treating source rule"). 20 C.F.R. § 404.1527(c)(2); see also Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at *36936. If "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence," the ALJ must "give it controlling weight." 20 C.F.R. § 404.1527(c)(2); Mays v. Colvin, 739 F.3d 569, 574 (10th Cir. 2014) (quoting Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)). Once an ALJ determines that pursuant to paragraph (c)(2) controlling weight is not warranted for a treating source opinion, the ALJ then can allocate weight between treating source opinions, examining, and non-treating physician opinions. See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2); Watkins v. Barnhart, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (explaining the sequential analysis). Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of examining physicians are given greater weight than the opinions of those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).[5]

---

[5] Social Security Ruling 96-6p explains: The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources. SSR 96-6p.

Substantial evidence supported the ALJ's finding that Dr. Laughlin's opinion regarding the severity of Plaintiff's impairment was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence." See 20 C.F.R. § 404.1527(c)(2), (Tr. 41). Thus, controlling weight was not warranted. See 20 C.F.R. § 404.1527(c)(2). The ALJ's explanation met the regulatory requirement where he had cited several exhibits and, a few pages earlier, had summarized evidence in those exhibits. See Endriss v. Astrue, 506 F. App'x 772, 775-76) (10th Cir. 2012)). The ALJ discussed in detail the totality of the medical record. Particularly, the ALJ observed and found consistent the September 2014 findings of Dr. Boatman (who addressed Dr. Robert's August 2014 in support of his opinion). (Tr. 123-136). The ALJ explained:

> [Dr. Boatman] reviewed [Plaintiff's] records . . . and opined [Plaintiff] could perform "light" work. I have provided some additional limitation based on more recent medical records. While I have given more extensive limitations, I rely on [Dr. Boatman's] opinion to the extent it stands for the proposition that [Plaintiff] is capable of at least sedentary work.

(Tr. 44) (internal citation omitted). Although Plaintiff argues that greater weight should be afforded to Dr. Laughlin since he is a treating physician and most recently rendered a medical opinion, nothing in the record suggests that Dr. Laughlin reviewed any treatment records from other sources and the sole source of medical history was from Plaintiff's reports and Dr. Laughlin's own medical records. (Tr. 761-67, 829 (treatment), 833-38 (October 2015 opinion). Dr. Laughlin's records or October 2015 opinion did not address Dr. Roberts' examining opinion, medical records from Tulsa Pain Consultants wherein it was observed that from June 30, 2014, through June 15, 2015, Plaintiff: (1) did not use an assistive device to walk; (2) was able to stand from a seated position without any significant difficulties or limitations; (3) was able to move all four extremities, and; (4) there were no new signs of gross motor or sensory deficits. (Tr. 695-710). Additionally, Dr. Laughlin did not address progress notes from Drs. Griffin and Jabbour where from September 8,

2014, to September 15, 2015, it was repeatedly noted that Plaintiff was able to perform present job duties. (Tr. 787-94, 98-99, 804-821). In Drs. Griffin's and Jabbour's notes from September 8, 2014, to November 25, 2014, Plaintiff's gait was normal and following examinations did not mention her gait. (788-93). Throughout the 2015 examinations, knee and shoulder pain were noted (Tr. 802-821), positive Tinel sign at the left elbow "but good motor and sensory exam," (Tr. 806), a positive Hawkins sign and 5/5 rotator cuff strength (Tr. 808, 810, 818, 820), and a positive Neer test confirming shoulder impingement (Tr. 814).

The ALJ reasonably allocated weight to Dr. Boatman's opinion wherein he thoroughly reviewed the record which included Dr. Robert's examining opinion, the records from Tulsa Pain Consultants, and records from Drs. Griffin and Jabbour. See 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (effective from August 24, 2012 to March 26, 2017) (non-examining consultants are "highly qualified . . . medical specialists who are also experts in Social Security disability evaluation"). Plaintiff does not direct the Court to evidence demonstrating significant deterioration of symptoms following Dr. Boatman's September 2014 opinion, as such a showing would lend support to the possibility of an ALJ reaching a different conclusion. See, e.g., Decker v. Chater, 86 F.3d 953, 954-55 (10th Cir. 1996) (discussing the relevance of significant deterioration following evidence demonstrating Plaintiff's ability to work); Boswell v. Astrue, 450 F. App'x 776, 778 (10th Cir. 2011) (affirming decision where ALJ correctly observed there was no objective evidence Plaintiff's condition "significantly worsened"); Tarpley v. Colvin, 601 F. App'x 641, 644 (10th Cir. 2015) (rejecting claimant's argument the ALJ gave too much weight to the state agency physician's opinion, who did not review later treating physician opinions, concluding "nothing in the later medical records . . . [demonstrates] a material change in [the plaintiff's] condition would render [the state agency physician's] opinion stale.").

Plaintiff's failure to demonstrate significant deterioration is viewed in light of the records from Tulsa Pain Consultants wherein it was repeatedly observed that from June 30, 2014, through June 15, 2015, that Plaintiff: (1) did not use an assistive device to walk; (2) was able to stand from a seated position without any significant difficulties or limitations; (3) was able to move all four extremities, and; (4) there were no new signs of gross motor or sensory deficits. (Tr. 695-710). Nevertheless, the ALJ still provided for greater limitations than those opined in Dr. Boatman's September 2014 opinion of Plaintiff's ability to do light work, and the ALJ found in Plaintiff's favor by limiting the RFC to sedentary work. Therefore, as the ALJ thoroughly reviewed the record and properly characterized Plaintiff's symptoms and functional limitations, substantial evidence supports the ALJ's conclusions.

**B.     ALJ's Rationale Regarding Inconsistency of Reaching and Fine Motor Limitations in Dr. Laughlin's October 2015 Opinion**

> Plaintiff argues:
>
> Additionally, the ALJ rejected Dr. Lauglin's physical medical source statement because Dr. Lauglin wrote that the Claimant would be limited to occasional reaching in all directions. The ALJ interpreted that limitation to state that [Plaintiff's] "arms would be immobile for all practical purposes for 6 hours out of an 8 hour day." The ALJ stated that such a limitation was inconsistent with Dr. Laughlin's opinion that the Claimant could do fingering and feeling frequently "as objects must first be reached for by extending the arms before they can be fingered or felt." On the contrary, SSR 85-15 does not state that for items to be fingered and felt that the arms must be extended. The Social Security Ruling cited by the ALJ simply states that reaching means extending of the hands and arms in all directions.

Pl. Br. 6 (internal citations omitted). In addition to the rationale that Plaintiff disputes, the ALJ explained:

> Nothing in Dr. Laughlin's treatment notes submitted with his MSS would justify immobilizing the claimant's arms for a majority of the workday, and there is nothing in Dr. Laughlin's treatment records at 3F that offer any reasonable support for that proposition. In contrast, in the physical consultative examination conducted by Dr. Roberts on August 30, 2014, the actual physical examination results were fully normal, including full range of motion both shoulders, cervical spine, and lumbar spine, with no pain noted on range of motion. It was also specifically found

> that the claimant could handle and manipulate small objects and could grasp tools such as a hammer. 7F/4-7.

(Tr. 41). Plaintiff does not offer any argument contradicting the ALJ's additional rationale for finding Dr. Laughlin's upper extremity limitations inconsistent with the totality of the evidence. Assuming the ALJ erred in his initial rationale regarding SSR 85-15, substantial evidence supports the ALJ's allocation of weight to the medical opinions and the ALJ's error would be harmless. See Scott v. Berryhill, 271 F. Supp. 3d 1235, 1249–51 (N.D. Okla. 2017) (discussing Vititoe v. Colvin, 549 F. App'x 723, 729-30 (10th Cir. 2013) (unpublished)[6] (citing Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.")). "Our review of the record indicates that the ALJ's question adequately included the limitations that she found were supported by the medical record. That record, along with the VE's testimony on existing jobs, provided substantial evidence to support the ALJ's step-five determination." Talamantes v. Astrue, 370 F. App'x 955, 959 (10th Cir. 2010).

## **CONCLUSION**

For the reasons set forth above, the Court **DENIES** Plaintiff's appeal and **AFFIRMS** the Commissioner's decision in this case.

SO ORDERED on May 22, 2018.

---

[6] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."